Case No. 11-1273, et al. DirecTV, Inc. Petitioner v. National Labor Relations Board Mr. Appleby for Petitioner Mass Tech Advanced Technologies Mr. Fritz for Petitioner DirecTV, Inc. Mr. Callahan for Respondent and Mr. Ginsberg for Amicus AFL-CIO Case No. 11-1273, et al. Good morning. Good morning. I'm Gavin Appleby. I'm here on behalf of Mass Tech. I appreciate your time this morning, Your Honors, and I will try to make this relatively brief if I can. It's a complicated case. A little bit of background to talk about in terms of why we're here, but before we do that, one quick housekeeping question. As you're probably aware from the Noel Canning cases, a lot of the NLRB cases got held up for a while. This is one of those. This briefs were filed back in early 2013. And I say that just because there are a couple of new cases from this court that actually have some relevance here. I'm going to reference some of those today, but we are also just, to make things easier for the court, going to file a very brief statement, not argument, just to reference the new cases later today. So, anyway, beyond housekeeping, let's actually talk about the case. The concerns that are here in this particular instance relate specifically to what the NLRB did when it reversed an administrative law judge. The issues related to this case steer down from the Supreme Court's decision in Jefferson's standard, which obviously everybody's talked about in their briefs. The concerns that Mass Tech has, and Direct TV as well, and they can speak for themselves, are effectively that the NLRB did not properly evaluate Jefferson's standard and did not properly apply it. And, in fact, there's more concern in that in the sense that if you look at the NLRB's briefs and its decision, in effect it's trying to actually change the standards that are appearing in Jefferson's standard. Jefferson's standard specifically focuses on three things. It focuses on whether behavior is disloyal, reckless, or there's malicious untruth involved. If you look at the NLRB case, what you will focus on and what they focused on is a lot of discussion about maliciousness. We're concerned because that is not what Jefferson's standard said, and specifically it's not what this Court has said in several cases that we've cited in our brief that I'll talk about in just a minute. There's also a concern relative to the standard that should be applied. They keep referring to an intent to be malicious, and the intent is a subjective standard as they framed it. But this Court has very clearly said that Jefferson's standard actually applies an objective standard relative to the question of intent, that intent is not the real focal point. The question is what happened and how far did it go as to what happened. Separately, I want to talk, as my time gets closer to the end, on the issue of credibility determinations. There is a very big concern in this particular case that the NLRB did not defer as it should have to credibility determinations made by the Administrative Law Judge, and in fact very specifically made determinations of fact that are absolutely contrary to the analysis that was done. Granted the Board's got discretion, granted the Board's got some ability to say we see the facts differently, what the Board doesn't have is the ability to make credibility determinations, and that effectively is what they did in this particular situation. I don't want to spend a lot of time on the facts, but I do want to talk in general what happened, because I think it's helpful to understand the movement that occurred in this particular case. Effectively, after Mass Tech changed its compensation system, there was a strong reaction, as you probably know from reading the briefs, and very strong. There were a couple of events that occurred where groups, large groups of installers, effectively challenged management, and there were at least two lengthy meetings that occurred, one in a parking lot, one at a conference room, regarding these situations. Nobody got fired over that. Nobody got disciplined over that. They were somewhat heated in regard to the meetings. But the difference, and the reason why this case is so important and fits under Jefferson's standard as the Supreme Court put it out, is because, in effect, what really happened here was the technicians moved their whole analysis from their ripping us off to their ripping the consumers off. And when that changes, that's what brings Jefferson's standard into the light of this situation. That all occurred when they went on television, and effectively then at that point the lies were made public, that they stated the AOJ specifically found that there was things that were not truthful stated to the public, that there was reckless and disloyal behavior related to allegations that the technicians had to lie to consumers, that there were chargebacks that weren't correct. There were a variety of other things fairly well laid out by the AOJ as to lies that were actually stated on the television show. So it's undisputed that the comments were related to an ongoing dispute. That's correct. We're not challenging that issue. So then when you say that the dynamics shifted from their being unfair to us to their being unfair to the consumers, your argument is that even though their comments are related to the ongoing dispute, the comments were related to dispute in a way to cast doubt on the quality of the services being offered, as opposed to cast doubt on the quality of the relationship between the employer and employee? Is that where you're getting at? Yeah, in effect, that's absolutely correct. And what I would say about that, to clarify slightly further, is Jefferson Standard effectively picks up with the issues of what happens when it goes too far. The fact that it's a labor dispute certainly gives it some room for people to say things that may be uncomfortable, but that room is obviously not unlimited. And particularly when they turn the issue to they're messing with you consumers, things change. And then the analysis applies about disloyalty, about recklessness. I don't know exactly why they're messing with you, but it seems like there has to be some room to make comments if they're related to an ongoing dispute that concern the quality of services or products being offered because they might be intimately related. So, for example, if the employees say, we're being grossly underpaid, and one of the consequences of being grossly underpaid, of course, is that people don't want to work here, the best people don't want to work here. And if the best people don't want to work here, of course it affects the quality of the services being offered because the best people are working somewhere else. In that kind of situation, it's definitely true that those comments concern the quality of the service being offered. It's also true that those comments are related to an ongoing dispute about pay. And would you read Jefferson Standard to say that employees can't make that kind of comment because it concerns the quality of services being offered? Or would you say, well, no, that's okay because, of course, it concerns quality of services being offered, but it also concerns the ongoing pay dispute, and they're intimately tied in a way that allows the employees to make that kind of conversation? One of the hardest parts, I think, about NLRB analysis and political law generally is that it takes sexual harassment as an analogy. There's always a line you cross, and the question is, when do you cross that line? In this particular instance, we do think that there are statements that could have been made that would have not crossed that line. But I don't think there's any question that the statements that actually were made did cross that line. I think Jefferson Standard and this Court's decision and Endicott both would support that, where Endicott, for example, a situation also talking about an employee who's taken statements about his employer that, if not certainly true, certainly were reckless and disloyal about management not having it together, gaps in terms of what the company presented and why the company wasn't the company that it should have been, presented to the consumers, and this Court found that went over the line. So I do think you're absolutely right that there are certain things that can be said, but at some point that goes away because you've gone too far. And what statements in this case bring it within the scope of Endicott? Because if in Endicott, as you describe it, the complaint was, well, the business is being tanked, statements to that effect, what are the statements here that go only to the quality of the service or product being offered, divorced from any connection to the ongoing labor dispute? The problem in this case is that they actually took it to the point where there were direct lack of truthful statements, false statements made. They were made about charges that the consumers had to spend, for example. One of the charges, one of the things they said in the television show, was that customers had to pay for certain services. That wasn't true. They did not have to pay for services. The issue was about inserting the telephone lines in. The services only had to be paid for in the very acceptable circumstances if someone wanted it hidden behind the wall as opposed to putting a plug in where the wall is. But they said they had the consumer right to pay for that. The technician said that they get charged back every time that there's not a telephone line installed. That is not true. In fact, they only got charged back if they didn't cover 50% of the line. Well, I thought you were focusing on the disloyal statements as opposed to the untrue statements. And I do think there's both in that context. Effectively, if you, and I didn't bring it with me, obviously, because I have a short period of time, but I'm hoping that the panel will actually see the video, which we've provided as an exhibit, because it's very telling in the manner that's promoted in there why this is so bad. This show was a show intentionally set up as part of a series of various shows. One of those shows that says they're out to get you consumers. The whole flavor is to that level. And if you watch it, you will definitely get a feel for that. And you can say something may just simply be untrue, but the way in which it was presented also makes it, in fact, disloyal. So one of the things... Go ahead. I wanted to go back to, you started by saying that the board could not reject the ALJ's credibility finding. But that, of course, is not exactly what our precedent says. And I may have stated that a little strongly, but certainly the ALJ is the one who's in that position. And let me touch on that, if you don't mind, for just a minute. Because I think what our precedent says is they may disagree with the ALJ, provided that their decision is supported by substantial evidence. If there's substantial evidence to support that, I agree with you. The problem here, though, in this case, actually, it's an interesting case in that one ten-second comment effectively creates chaos in this case. It's a comment made by the manager of MozTech, Chris Brown, when after a two-hour meeting of him trying to convince these people to put the telephone lines in and just quit complaining, when he then decides to crack a joke to try to get everybody back to work and states, what do you want me to say? You know, and tell the customers the thing will blow up if you don't put the telephone line in. Everybody laughs. I'm the only person in this courtroom that was there. It was even funny in the courtroom. Long story short, the credibility issue, the ALJ specifically finds that that's a joke and was not intended to carry it, that you must lie to consumers. The board completely ignores that. It is not there, had to be there, wasn't there. The board said it was joking, I thought. Well, the board said it was joking, but then it said the context of the comment is that it effectively created the basis why those people should be lying or could be lying, and it would be protected. But I thought the board, I thought maybe I misunderstood what the board said, but I thought what the board said was that comment was jokey, but when taken in addition to the statements by both direct TV personnel and MazTech, I'm sorry if I'm mispronouncing the company. Yeah, go ahead. To the effect that, you know, you ought to tell them that this is required and won't work without it, that those statements aren't exactly true because it can work without the attachment and the statement about, the joking statement about that it might blow up was sort of an appendage to the at least arguably untrue statements that had been urged upon the employees beforehand. What the board effectively said in its decision was that it realized that was stated as a joke. I agree with you on that. I don't mean to misstate that. However, they went on from there and effectively said that that allowed, in a sense, lies, and the lies were not malicious because of that, and the lies were not overstated because of that. And they are, in fact, not true, though. And the whole analysis on the statement made by Chris Bryan, where the AOGA was very careful to say, to the degree that that's alleged to be the basis for these issues, that clearly was not intended in that direction. As a matter of credibility, I find that there was no effort by Mazda to make a statement that was untruthful and tell the employees to use the same. And the board just simply disagreed with that. This is our concern. Moving away from the credibility issue, just to talk briefly about this Court's cases and why we're so concerned relative to the issue of how far down that path we were talking about they've gone, what Jefferson's standard clearly says is disloyal, reckless, or maliciously untrue. What the Court is focused on is something that's much more egregious than that. And they had moved the line, or at least trying to move the line, despite the fact that the Supreme Court set the line. What the Board says, just to give two examples, and it's brief, on page 47. Rather than talk about disloyalty, the Board uses the term flagrantly disloyal, a term not used in any other case that I've ever seen in this area, and a term that clearly is not what the Supreme Court was reaching for when it was talking about the Jefferson standard case. The Board also talks about intentional misrepresentations, and maybe that's the same as malicious lack of truth, but it ignores the question of disloyalty, ignores the question of recklessness. In Endicott, what this Court said, it used the following terms, detrimental disloyalty and a recklessly untrue. And those are not terms. Those are lesser terms than the Board is trying to use. There's also not a question of subjectivity here. The question is, is this across the line from the objective standard? And the Hormel case that we've cited in our brief in this Court basically says exactly that. So can I ask you a question about Endicott first and then Hormel? Sure. On Endicott, one thing that's interesting about Endicott is the procedural posture of that case, it wasn't reviewing a disloyalty determination made by the Board. Because the Board, in fact, I think the Court's point was the Board just didn't say anything about disloyalty, and it canted the standard that encompasses both untrue statement and disloyalty, but then it only did work on untrue, it didn't do any work on disloyalty. And so from that standpoint, when the Court is rendering its decision on disloyalty, it's by definition not reviewing a Board determination as to disloyalty. So it didn't have before it this elaboration of disloyalty, which, as you rightly say, is flagrantly disloyal, wholly incommensurate with. So the Endicott Court wasn't looking at that standard at all, because the Board hadn't talked about disloyalty at all. It was just sort of stating in the first instance its own interpretation of disloyalty without the benefit of a Board gloss on it. I think you can argue that Endicott wasn't the same case from the perspective of the facts that led to the analysis like you're questioning in terms of, do different cases have loyalty being a factor and other cases having lack of truthfulness being a factor? Right, right. I understand that that's a consideration. I do, I think, though, that the Endicott terms and the way the Court evaluated the Endicott case, if applied here in general, would lead to a different result than the Board case. Okay. Just real quickly, two cases that I wanted to talk about that are new. One from just 2015, it's the AT&T t-shirt case, Southern New England Telephone, and it's a case that is not exactly on the same standards. It's a t-shirt case. But the analogy is there, and this is what this Court said about that case. Common sense sometimes matters in resolving legal disputes. No company, at least one that's interested in keeping its customers, presumably wants its employees walking into people's homes wearing shirts that say inmate and prisoner. But the NLRB ruled that AT&T committed an unfair labor practice. While it's a t-shirt, this case is very similar to that, in that ultimately television walks into your home too, and exactly in this case had the same impact those t-shirts would have had. Finally, and I'll quit. I know my time is about to be up. But going back to the credibility issue for a second, Judge Rahn actually wrote very recently, in 2013, in Flagstaff Medical Center the following. At oral argument, the Board warned us against second-guessing its expertise, where we know nothing about the tone of voice that was used when making a contested statement or the body language accompanying it. But of course, the person entrusted with evaluating witness credibility, the ALJ, articulated his judgment about the factual record by finding the NLRB violation. We believe that language is very applicable for this situation. All right. Good morning, Your Honors. I'm Jonathan Fritz on behalf of DIRECTV. I'd like to reference some of the cases that Mr. Appleby referenced, the Endicott case, the Hormel case, but also the Overstook County and the Ampersand Publishing cases. All of those cases, this Court rejected the Board's interpretation of the scope of protected activity. And what the Board is doing in this case is not only adhering to its interpretation as to the scope of protected activity, it is extending that beyond the employer-employee relationship. DIRECTV in this case was not the employer of the employees. DIRECTV was not even alleged to be a joint employer of those employees. DIRECTV was Mostek's customer. The employees had a dispute, certainly, with Mostek about its compensation policy, but DIRECTV did not dictate how Mostek compensated its employees. DIRECTV only required that Mostek connect at least 53% of receivers to a phone line. That was a reasonable goal. There were legitimate reasons for that goal, and DIRECTV did not require that Mostek change its compensation policy in response to that goal. The employees, however, did not confine their speech to their compensation dispute with Mostek. They went to the television station in DIRECTV trucks, wearing DIRECTV uniforms, and they attacked the integrity and the business practices of DIRECTV. As the administrative logic... Just a fashion question. So when they go on site to actually do an installation, are they wearing DIRECTV uniforms in DIRECTV trucks? Yes, Your Honor. And that's fine? That's perfectly fine with DIRECTV? Yes, Your Honor. The point I'm making is that they chose to go to the television station not in their civilian clothes, if you will. They chose to go in DIRECTV trucks with DIRECTV uniforms, thereby making DIRECTV the focus of their remarks. I take it what they're doing is part and parcel of the notion that the speech they're engaged in is commensurate with the employee grievance that they have, and the best way they can make that happen is to not show up in their civilian clothes, because if they showed up in their civilian clothes, it would look like something different. So what they're doing is they're saying, this is me as the guy or whether it's he or she who goes to install your equipment, and now I'm, as an adjunct to that, carrying on my complaint. Well, Judge Srinivasan, if the employees had gone there and said, we have a dispute with Mosdek about our compensation, if that's all that happened, that would be a much different case. But they went there not to say, we have a dispute with Mosdek, and to seek the public's support in their compensation dispute with Mosdek. The overall tenor of that broadcast was an attack on DIRECTV as a customer and an attack on DIRECTV's business practices, not the compensation dispute. So it was not speech that was limited to their employer. It was not limited to the issue of compensation, and it purported to be in the public interest. It was not an appeal for the public to support the employees in their own self-interest in changing the compensation policy. They were purporting to be warning the public not to do business with DIRECTV because they claimed that DIRECTV had told them to lie to the consumer and public. So the board looked at those facts, though, in the context of DIRECTV was not just one of many customers. It was the customer in the Orlando market. That's correct, Your Honor. Furthermore, what was it called, a training video? Yes, Your Honor. The customer prepared by DIRECTV was as well as one of the men who appeared a DIRECTV employee stating it's all DIRECTV. So in this context, it's not just a mere customer, but it's a customer who's very much involved in what's going on and what the demands are that are being made on the employer. Isn't that correct? Judge Rogers. I mean, let me put it this way. Isn't there substantial evidence in the record to support that view of the context? Well, Judge Rogers, the video, the point of the video, was simply for DIRECTV to say to any contractor, it was not just for Mazda or its employees, but to say to any contractor, this is why it is important to connect the receiver to a phone line. The equipment won't work the way we want it to work, won't have all the services and functions unless it's connected. The video didn't say anything about compensation. It didn't say anything about any other terms and conditions of employment. It was merely the customer's direction to the contractor and the contractor's employees about how DIRECTV wants these installations to be done. What about the DIRECTV employee? There were DIRECTV employees in that video. No, I mean at the meeting. There were no DIRECTV employees at the meeting. If you're referring, Your Honor, to the statement about the receiver blowing up, that was misattributed by the board to a DIRECTV employee, Scott Brown. The person who made that statement was a Mazda employee, Christopher Brown. So what the DIRECTV employees themselves did was in the video, and the video told the contractors to tell their technicians, to tell customers, that the phone line was a mandatory part of the installation and needed for the equipment to function. That's correct, Your Honor. But again, the point of that is that that is part of the installation that DIRECTV wants the contractor to perform. And so all that DIRECTV is telling the contractor and its employees is this is the standard part of the installation we want it to be done in order for the equipment to function the way it's supposed to function. But again, it has nothing to do with how the employee will be compensated. As a result of that, it is simply a direction to perform the work that DIRECTV wants its contractor to perform. What does it mean that it's a mandatory part of the installation if it's not, in fact, technologically necessary for the product to work? It's part of—DIRECTV pays Mazda Tech to do it. So it's part of the standard installation package. It's free to the customer as long as the customer doesn't want some custom work. But it's mandatory in the sense that it's part of the basic installation package. Mazda Tech—and there's a document in the record at page 509 of the joint appendix, which is the worksheet that Mazda Tech would give to customers which would indicate that the phone line installation was part of the basic installation package and that any custom work was sort of below that, below the line. So it was mandatory in the sense that that's what DIRECTV was telling Mazda Tech that should be done as part of every installation because although you could still get a signal on the satellite receiver, you couldn't do a lot of other things both presently and in the future in terms of the full functionality of the system. I see my time's up, so I'll sit down. Thank you, Your Honors. Thank you. Good morning, Your Honors. Douglas Callahan on behalf of the National Labor Relations Board. I'd like to focus the Court's attention on the fact that the Mazda Tech technicians' statements in that broadcast did not go beyond what was necessary to communicate the scope of their labor dispute. They focused on two things. Repeatedly, they went back to two things, the charges, the back charges, $5 for every non-responding receiver, and number two, the fact that management had instructed them to make certain misrepresentations to customers, including that the receiver wouldn't work when in fact it would without a phone line. What's important is what they also did not say. They did not, like the person in Endicott, like employee White in Endicott, make any sort of gratuitous insult directed at management. They did not make an appeal to the customers of DirecTV to stop using DirecTV's services, and they did not attempt to injure Mazda Tech or DirecTV's reputation beyond what was necessary to communicate the essence of their labor dispute. Now, what this means is that- I don't think that it would be a problem for a business's representation to say to consumers, this company lies to you, this company forces us to charge you for things that you don't need, this company forces us to-if we don't lie to you, we don't get paid. You don't think that would be a problem? There's no question that it's prejudicial, but there's also no question that the mere fact that it's prejudicial doesn't resolve this issue. If you look at-this is not a sparse area of the law. There are a lot of cases in this area of the law interpreting Jefferson's standard. It's not just Endicott. There's Circle Bindery from the First Circuit, Misericordia from the Second Circuit, Sierra Publishing from the Ninth Circuit, and then Learned Hand's opinion from the Second Circuit and Peter Koehler. And in all of those cases, they make clear that the mere fact that conduct is prejudicial to an employer does not remove it from the act. That's not consistent with the way the act is structured. All sorts of labor activities are prejudicial to the employer. And that goes to- So I think that there's a potential line to be drawn, as your colleague on the other side was doing, I think, between statements that are definitely prejudicial in the sense that they say, this employer should be strongly condemned because it's being terribly unfair to us, the employees. That's undoubtedly prejudicial to the employer, and if a consumer is interested in that kind of criticism, then the consumer will be concerned about that employer because they think that this is an employer that's being terribly unfair to the employees. I'm going to look elsewhere. But then also, that's one type of statement that could be made. And then you could take the statement and say, and this employer's services are also bad, or this employer's product is also bad. So you could attempt to draw a line between those two kinds of scenarios. Now I take it your argument is that, yes, I think logically it's possible to draw that line, but legally that's not where the line is drawn because some statements that are bound up in a labor dispute can call into question the quality of services or products and still be protected. And then if that's true, I guess my question is, what's the line then? Suppose that is true, that you can make statements that criticize the employer-quad product-service, not just quad relationship with employees, to some extent, and still maintain the protections of the Act. But then there are some statements that are so disloyal that even if they're bound up in the context of a labor dispute, they still go beyond the pale and they're actionable because they fall within the Jefferson Standard sliver. How would you characterize that line? Well, it's not an easy bright line to be found in the case law or one that I can offer to you now. And there's no easy bright line rule to be distilled from Jefferson Standard. Jefferson Standard itself was certainly set on the facts of Jefferson Standard, certainly lie outside of the protection of the Act. But Jefferson Standard did not lay down some sort of very definite methodical approach for analyzing these cases and didn't draw that line. But the line has been drawn on a case-by-case basis by the board and the courts. There are certainly cases in which conduct has been deemed unprotected. Mountain Shadow Golf is a very important case for this issue. Not only the First Circuit's opinion in 2008 but also the board's decision in 2007 in which the board found that certain handbills crossed that line and began to resemble the handbills in Jefferson Standard and therefore lost the protection of the Act. I'd also point the court toward American Arbitration Association. But is that because one line that could be drawn is as in you could say that Jefferson Standard involved, at least with the unprotected handbills, handbills that made no connection whatsoever to an ongoing labor issue. So that's one. You could draw that line. But then as I understood the board's position and the board's cases, that's not the line that the board draws because there are some situations in which statements are connected to an ongoing labor dispute but still cross the threshold and become so disloyal that they're actionable by the employer. For example, in the American Arbitration Association where the letters that were sent to customers actually ridiculed the employer. They were incommensurate with the employee's dispute and unnecessarily tarnished the employer's reputation. Unnecessarily tarnished. That's language from the First Circuit's decision, I believe, in Mount Desert Island. I'd also point the court toward Coca-Cola bottling, 186 NLRB 1050. Five-star transportation, 349 NLRB 42, which I've mentioned before. Just looking at the facts of this case, the board points to the fact that it's undisputed that the employees did not have a chance to see the TV program before it was aired. And they had no control over what the TV station was going to do with the interview. But the argument is that they were there at the interview and they could have said, well, no, it's not $5 or $52 every time. It's only when you want some customized work. But our basic concern is the following. In other words, is there some obligation, even in the context of a labor dispute, that the employee not go beyond what is necessary in terms of accurately stating what the dispute is about, where the employee knows that the TV person is elaborating in a false, making a false statement? There is no evidence that the employees knew the TV station was going to make false representations. I think the presumption is quite the opposite. This is a mainstream TV station. And the employees went to them believing that this TV station would do the decent journalism that it normally does. What I think we really have to avoid here is chilling employees' speech by claiming that these employees who, by going to a third party, are necessarily giving up control over their message to some extent. That by doing so, they become responsible for every single editorial decision that's made by Channel 6 in this instance. Employees have an undisputed right to go to third parties, and that includes to newspapers. And if you go to a newspaper, or perhaps to a more sensational outlet like a news channel, there's going to be some loss of message, and the news channel is going to hone in on what it finds important. There are limits on what the news channel can say. The news channel still holds itself out as a respectable journalistic organization. It has certain standards it has to comply with. It's liable, unliable, for any misstatements that it makes. But these employees, after having tried as hard as they could to resolve this dispute with their employer, when they finally felt compelled, when they felt it was necessary to bring their dispute to a third party, and they went to Channel 6, there was nothing inherently disloyal about that. And the fact that they, in doing so, were giving up some control over their message, does not mean that what they were doing was disloyal. That's inherent. That kind of giving up of control is inherent in appealing to third parties through a newspaper, through a TV channel, what have you. So is it the position of the board that employees are protected no matter what the conduit that they use? So they go to a TV station and to a reporter who, in fact, does a specific kind of reporting, and that reporting is sort of skullduggery by corporations. And that's who they appeal to, and that's who they want to talk to, and they know that. And so is the board's position that no matter who you appeal to, no matter what kind of program it is, the employees continue to have the protection of the Act, no matter what? It's imaginable that there could be some factual circumstance where the journalist or, you know, in our current age, the blogger was so unreliable that the employees would be losing the protection of the Act by going to them. But that's not this case. This is Channel 6, and I'd ask the court to, like a Mass Tech Council advised, look at this newscast. It's not a crazy newscast. It's not, you know, it's not Pulitzer Prize-winning journalism, but it's the bread and butter of American journalism today. It does, there doesn't, there is admittedly a shift in focus in the newscast from the pay practices to the misrepresentations. But number one, it needs to be remembered that these misrepresentations that these employees were counseled to make by Mass Tech management, those misrepresentations were part and parcel of their labor dispute. They had a dispute over the back pay charges. They went to management and they said, how can we eliminate these back pay charges? And management's response to them, in addition to other sorts of more or less deceptive practices, was to tell customers lies, was to tell them that this responder would not work if it's not hooked up to a phone line, or that the connection of a phone line was mandatory, when in fact it wasn't, and these technicians would install receivers without phone lines all the time. Those... The counsel just pointed out that what they mean by mandatory may be somewhat different from what you're implying, which is not to say that your receiver wouldn't work, but that the contract between Mass Tech and DirecTV made that mandatory. It would have been great if DirecTV had said that then in the instructional video. But if you look at that instructional video, a transcript of which is at appendix page 431, you'll see that Steve Crawford from DirecTV never mentions that subcontractual arrangement between Mass Tech and DirecTV. He says, you're going to put it back on the customer. You're going to say that it's mandatory, and they've got two options. They can either install the phone line, or we can run a wall fish or a wireless jack. The... DirecTV made no attempt to bring out that particular subtlety. In fact, it was trying to imply something quite else to customers. And I believe that... It's... I don't believe there's evidence for that, Your Honor. I mean, the... If you look at... One of the other things that's apparent when you look at this news broadcast is that these employees' statements have been heavily, heavily edited. The journalist cuts these employees off in mid-sentence in many cases. And what you... And so what... And what's left, these partial statements from the employees in this highly edited newscast, falls far, far short of reaching the actual malice standard. I would argue the actual malice standard was treated by the Sixth Circuit in the case Joe Leaf, which is mentioned in the board's decision. And in the Sixth Circuit... And the Sixth Circuit reversed the board, finding that there wasn't sufficient evidence of actual malice in that case. The board had found actual malice. The Sixth Circuit said there wasn't enough. And I would argue that in this case, there was so little evidence of actual malice that if the board had found the other way, the board would have been reversed on appeal by this court. But that's a question that I want to ask you because it seems to me that the rule that the board articulated based on Jefferson's standard was disjunctive. In other words, it said, you know, disloyal or reckless or untrue. And the board here focuses only on untrue, right, and maliciously untrue. That's untrue, Your Honor. Well, okay, then correct me if I'm wrong. But that's what they seem to be doing is focusing on the truth or what they view as the truthiness of these statements. The board discusses actual malice on page 5 of its decision. It then shifts into a discussion of disloyalty on page 6 of its decision. I'm glad that you brought up the articulation of the board's standard, the Mountain Shadow Golf Standard. It's not put forth by the board as a test in which each one of the prongs is airtight and self-sufficient. It's not, in other words, what the board was trying to distill was the teaching of Jefferson's standard. Jefferson's standard itself, however, itself is a case that doesn't present a clear approach, a clear methodological step-by-step, you know, multi-pronged approach to evaluating disloyal comments. The board, in formulating the Mountain Golf Shadow Standard, was just trying to heuristically indicate what's relevant to the court's analysis. But, for example, the fact that the first prong references a labor nexus does not mean that the labor nexus is irrelevant to some of the issues under the second prong. For example, disloyalty. What you see reflected in the case law is that in analyzing that disloyalty prong, courts and the board have always looked to just how tight that labor nexus is. Yeah, it comes back in. I mean, it's kind of interesting that nexus is the exclusive province of prong one, but then, in other words, that prong one is only about nexus. But then, prong two, nexus also creeps back in because I think the board's gloss, at least on the disloyalty component, is flagrantly disloyal, wholly incommensurate with any agreements which they might have. And when you're doing wholly incommensurate, it necessarily comes back into nexus, and so nexus comes back in. I'm in whole agreement with you, except for the fact that it's not creeping back in. That's always been there. And the board never, I think, separated it. Well, it's always creeped back in. I guess I'm not making a statement about when it happened. I'm just saying that it comes back in because of the way the board has applied the disloyalty prong of the disloyalty strand of prong two. That's exactly right. And I think one of the things that this case presents an instance in which the employee's statements are actually so tightly tied to their labor dispute that they only said what was necessary to communicate their labor dispute. And if you hold that their statements were unprotected, you're essentially saying that the act sanctions the termination of employees for doing nothing more than publicizing their labor dispute through a third party. And I think that can't be a correct result. So can I ask you about the application of the disloyalty strand of prong two, specifically with respect to the intent component? Because the board's decision, as you say on page six, talks about disloyalty, and there's three points that the board makes in explaining why these statements didn't rise to the level of actionable disloyalty that would be something within the province of the employer that could terminate it for cause. And one of them is intent. And we, of course, have our HOMEL decision about it that speaks to the question of intent. So the question for you is, and I'm wondering if there's a disagreement potentially between you and your supporting amicus on this, which is that if we assume that the intent reference made by the board in its decision is subjective intent, not as you suggest in your brief that actually what they're getting at is a bunch of objective considerations, but really that we think what the board is talking about is subjective intent. And the question is, is that at this stage of the analysis foreclosed by HOMEL, or do you have an argument that says that no, HOMEL was speaking to a different question and foreclosed the use of subjective intent as to that different question, but as to this issue that's being addressed by the board here, it's okay to talk about subjective intent? Definitely the latter. Two points, one about Jefferson Standard, the second about HOMEL. Jefferson Standard explicitly referenced the employee's intent and based its holding upon the employee's intent. I refer the court to pages 476 to 477 of Jefferson Standard, in which the Supreme Court said, the only connection between the handbill and the labor controversy was an ultimate and undisclosed purpose or motive. The Supreme Court had honed in on the employee's motive. And that is, so number one, HOMEL, insofar as it contradicts that, is not controlling. But I don't think HOMEL does control that. What HOMEL was talking about was subjective and objective evidence of intent. In HOMEL, this court said that the board had illegitimately relied solely upon the subjective professions of the discriminantee himself, who got up there and said, no matter where I was in the boycott, no matter what I did in the boycott, in my heart of hearts, I was not participating in the boycott. And the court said, phooey, no, you can deduce intent from objective evidence. You can look at the circumstances surrounding somebody's actions. And you can, from that, derive a finding of intent that might be wholly contrary to what that person subjectively believes. I don't think that's a novel idea in the law at all. And I think that's one of the reasons why, in that opinion, Judge Ginsburg quotes HOMEL. I think it's actually kind of like a universal principle that you can deduce somebody's intent from indirect objective evidence. And that's what the Supreme Court was doing in Jefferson Standard in that passage I just quoted. And that's what NLRB was doing in this case. The NLRB was not relying upon these employees' direct testimony on the stand saying, I did not intend to harm the company. You won't find that evidence, actually, in the record. What the board was relying upon was the nature of the employees' statements. The employees did not get up there and try and stick it to DirecTV unnecessarily by saying, all consumers should stop using DirecTV services. DirecTV's management is going to put this business into the dirt. DirecTV is a terrible company. They said nothing like that. They said, they're charging us. They're giving us a financial incentive. They're penalizing us $5 for not installing these responders. And in response to our complaints, they're telling us that we should make misrepresentations to customers. That's what they were. And so in this, and from that, the board determined, the board inferred, that these employees' primary intent was not to harm the company, but rather to publicize their labor dispute. And it did so on the basis of objective evidence. And so for that reason, I think Hormel came to the right conclusion, probably. But I think Hormel is in no tension with, no tension with the board's finding in this case or with Jefferson Standard. And I believe the one sentence that Judge Ginsburg has to the extent that the test of disloyalty always has to be objective, it's overbroad. I mean, it's a lovely sentence, but it's overbroad. It was unnecessary to decide that case. And it's inconsistent, I think, with this whole area of law. And it's not just the board that has relied upon intent in evaluating the potential disloyalty of employees' behavior. There are other courts that have done it. I know the Eighth Circuit and Greyhound Lines has. And it's also a recurrent, it's a recurrent factor in a lot of the cases on this area. But, you know, Hormel requires that objective test because it says otherwise employers could never fire disloyal employees without having liability unless they could determine correctly that, you know, what their actual motivation was. But I would argue that the cases that I've cited to this court in which the board has found that employees' statements were not protected, Mountain Shadows Golf, American Arbitration Association, Coca-Cola Bottling, Five Star Transportation, those are cases in which intent was relevant and yet the employer nevertheless was entitled to fire those employees. So I don't think that... But I thought what Hormel was getting at was this, and this is related to the concern Judge Brown rightly raises, which is that the concern expressed by the opinion in Hormel is that unless we take into consideration objective factors, there's no way to give effect to the entitlement of an employer to fire someone for cause in a situation in which we're dealing with conduct that's presumed to be disloyal if we think that the employee was participating in that conduct. So you take as a given that the conduct is disloyal, which is after the dispute is over you're still urging a boycott. And then the question is, is this employee participating in that conduct? Well, if you look at that purely as a subjective matter, then it becomes really problematic because, as Judge Ginsburg pointed out, somebody could go to a rally wearing a T-shirt and then they could defend themselves by saying, well, yeah, it's true I wore a T-shirt that supported the boycott, but actually I didn't mean to subjectively support the boycott. It just was the T-shirt that was at the top of my drawer. In which case the response is, well, that can't be right because then the employer has no ability to take action in response to what's conceivably disloyal conduct and the issue is whether this employee was participating in it. As to that, we can't look at subjective motivation. We have to take into account objective considerations or else the employer has no rights at all. Whereas in this case, I didn't understand this case to be about that subsequent question about whether conduct that's presumed to be disloyal is conduct that's engaged in by the employee. This case has to do with the antecedent question of whether the conduct is disloyal in the first place. And as to that, it's not completely out of bounds to look at subjective intent. We can ask questions about the extent to which subjective intent can govern the inquiry, but Hormel doesn't tell us that it's completely out of bounds to look at subjective intent for purposes of this aspect of the inquiry. What it rightly tells us is you can't allow subjective intent to be a bar to an employer's ability to fire someone who's engaged in something that is disloyal conduct and would be actively disloyal assuming that the employee was in fact participating in it. The only thing that I would say is that there's a need to unstick some concepts here. Intent is an inherently subjective concept. What I think the conversation is better held if we're talking about subjective and objective evidence of intent. And I think what Hormel really hones on in is that you give an employee an out in every instance if all you care about is subjective evidence of intent. Because who knows the employee's own personal heart of hearts better than the employee himself? And so subjective intent actually strikes me as a little redundant. I would just say the question is whether intent is proved through subjective or objective evidence. If I could talk about the ALJ issue. The ALJ's determinations that the board overruled were determinations that were based on the interpretation of the video. And the video was evidence that was in front of the ALJ but that was also in the exact same form in front of the board. The board was not reversing credibility determinations based upon witness demeanor or what happened in the courtroom. The ALJ did make credibility determinations based on witness demeanor. But those were the determinations that were against the company. The ALJ found that these employees truthfully explained what they had been told by Mass Tech Management. The ALJ found on page 16 of the decision that Mass Tech Management had in fact told these employees that they should tell customers that Responder won't work if it's not plugged into a phone line. And that credibility determination was legitimately and rightly accepted by the board. The board only reversed those determinations that were based upon this video. And of course the board had as good an opportunity to interpret that video and watch the video as the ALJ. All right. Thank you. Thank you. Counsel for Amicus. May it please the court, Matt Ginsberg on behalf of Amicus AFL-CIO. I think it's worth in the few minutes I have honing in on the specifics of this labor dispute which really helped to illustrate some of the issues that have been discussed already. Now here the employer, Mass Tech, told the technicians, look, you have to connect 50 percent, at least 50 percent of these receivers, DirecTV receivers to telephone lines. And if you don't, we're going to dock your pay by $5. Not for every receiver that you don't connect that drops under 50 percent, but actually for all the receivers you don't connect in the time period. So if you use the hypothetical that Mass Tech provided to the technicians, you can see a technician who installs 100 receivers, 101 receivers in the month is the hypothetical and is able to connect 50, not 51, is penalized $5 for each of those 51 receivers they can't connect. That's $255. It's a lot of money. Importantly, the technicians objected not just to the loss of pay, which was very significant, but also to the fact that they were going to be losing pay because of factors outside of their control. It's undisputed in this record that many customers didn't have landlines. And if there's no landline, the technician can't connect the receiver to a telephone line, and they're penalized for that. It's counted as part of their overall percentage. It's also undisputed that many customers did not want these telephone connections because it would allow their children to order pay-per-view programming over the remote control, and that's something that some customers simply didn't want. And it's also undisputed that some customers, even if they allowed the technician to connect the receiver to the phone line, would then disconnect it, and that would also be counted against the technician. So when the technicians raised all of these objections, Mass Tech didn't dispute the facts. In fact, they were under an obligation from DirecTV, as counsel has already stated, to only connect 53% to phone lines, which is a tacit acknowledgment that this can be a hard thing to do. Mass Tech didn't dispute the fact that this was difficult. Instead, they said, do whatever it takes, even if that means telling customers that it's mandatory or telling customers that the receiver won't function without the connection. The ALJ specifically found that supervisors told employees to tell customers that it wouldn't function without the connection. And, again, I would draw back the Court's attention to the video that was recorded by DirecTV Vice Presidents Crawford and Brown, that's Vice President Scott Brown, which was shown to the employees in the midst of this labor dispute, where the whole premise of this discussion is how to overcome the objections. This is a couple of ideas that we hear from techs on how they overcome the objections, referring to customer objections. And those ideas include telling the first idea is not to say anything at all to the customer about the need to connect the phone line. And that contradicts Mass Tech's own guidance to employees that they should have a conversation with the customer, planning out how the installation will go, including any custom work that might need to be done. But in addition to that, the video says you can tell the customer that it's a mandatory part of the installation and I need it for the equipment to function correctly, and that's a quote. And I think it's within that context that when the technicians complained about their labor dispute, they were well within their rights to say, you know, look, this pay policy is unfair, but not only is it unfair, but when we told the employer why we can't do this, they didn't quarrel with us about how hard it is to do. Instead, they said, well, just tell the customer whatever you have to tell to install the lines. And it's almost like a statement against interest by the employer that, in fact, there was some validity to the technicians' objections to the pay dispute. So we think in a case like this, where the asserted critical comments are inextricably intertwined with the labor dispute itself, and this is clearly a labor dispute case, that this falls well, this is easily distinguishable from Jefferson Standard, obviously, and also from Endicott, where the comments did not go to the labor dispute, but instead were caustic comments about management. If we take as a given that comments are related to a labor dispute, do you think that that means necessarily that the comments are protected, or do you think, do you read the cases and the board's decisions to accommodate the possibility that, even though the comments are related to an ongoing labor dispute, they can still cross the line and become actionably disloyal? Yes, they can still cross the line and become actionably disloyal. But I think this is a case that illustrates, I think, very well that in some cases they are not disloyal, even though the employer may not like the comments to the extent they are inextricably intertwined with the labor dispute and are necessary as a means to reasonably explain the labor dispute to the public, which is protective, that this is protected activity and is not covered by Jefferson Standard. Thank you. Thank you. All right. Counsel from NASDAQ? Just briefly to get a couple of things, and maybe starting with the issue of the credibility again, and going back to the Chris Brown comment we talked about earlier, let me actually read you what's in the decision by the board, and this goes to the context of whether or not there was an effort to try to tell the employees they should lie. Was it false or not false? Brown's joking suggestion to tell customers that an unconnected receiver would blow up underscored that message, i.e., the direction to lie, as it is undoubtedly was meant to do. When you get into, as it was undoubtedly meant to do by a person who wasn't the credibility determiner, that person's very credibility determination. Relative to some other points, very quickly on the issue about the employees don't control the television spokesperson, we understand that. That said, the facts in this case are that the employees specifically stated in testimony that they saw the television person as their spokesperson. That's the term that they actually used. In addition, they're the ones who told the television station what they believe the facts were. The television station wasn't making this up.  Third, remember Hormel was about a person who didn't say anything at all about anything and just happened to be along for the ride. This case is no different from that case in that sense anyway. On another issue, and this will be a very brief one, when the board says at the beginning of its oral argument that the employees did not appeal to stop using the services, it's correct they didn't use those words. But when the statements were made that were so indictful and so difficult relative to consumer perspective about these two organizations, clearly the intent was exactly the same, that they want the message to be send to customers that these were bad employees. It seems very clear there's no way to get around that. Did they use the words stop using services? No, they did not. Well, they didn't want that because they wanted to keep their jobs, right, and get this pay thing resolved. That's the other way to look at it. I hear what you're saying, but if I wanted to keep my job, I don't think I would have worn my DirecTV uniform and taken my DirecTV truck on television to make those statements. But I understand what you're saying. Thank you very much. If you have anything you wish to say for DirecTV, that's fine. If not, we will take the case under advisement. Your Honor, if I could just make one brief point. Sure. Counsel suggested that the employees could have said on this broadcast, this pay scheme, this compensation policy is unfair because it's really hard to meet this 50% goal because landlines may not exist in the home or the customer may disconnect it or any other reason. But the fact of the matter is the employees never mentioned a 50% goal. They said, if we don't lie to the customers, we lose money. So they never qualified it to say that there was even this 50% goal, which was a reasonable goal. Maztec was the lowest performing home service provider, any in the country, in terms of meeting that goal. So it was a reasonable goal. It was never mentioned. Thank you. Thank you. We will take the case under advisement.
judges: Rogers, Brown, Srinivasan